## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Hon. Leda Dunn Wettre |
| v. | : | Mag. No. 20-13001 (LDW) |
| MICHAEL CHEFF | : | **CRIMINAL COMPLAINT** |

I, Kelly Blanchfield, being duly sworn, state the following is true and correct to the best of my knowledge and belief:

### SEE ATTACHMENT A

I further state that I am a Special Agent with the Federal Bureau of Investigation, and that this complaint is based on the following facts:

### SEE ATTACHMENT B

continued on the attached pages and made a part hereof.

_____
Kelly Blanchfield
Special Agent
Federal Bureau of Investigation

Sworn to before me, and subscribed in my presence
on the 6th day of January, 2020
at Newark, New Jersey

HONORABLE LEDA DUNN WETTRE         _____
UNITED STATES MAGISTRATE JUDGE      Signature of Judicial Officer

## ATTACHMENT A

### Count 1
### (Conspiracy to Deprive A Person of Civil Rights)

On or about November 14, 2017, in Passaic County, in the District of New Jersey, and elsewhere, defendant

**MICHAEL CHEFF**

knowingly and willfully conspired and agreed with others to injure, oppress, threaten, and intimidate Victim 1 in the free exercise and enjoyment of the rights secured to Victim 1 by the Constitution and laws of the United States, including Victim 1's right not to be deprived of property without due process of law by one acting under color of law.

In violation of Title 18, United States Code, Section 241.

### Count 2
### (Falsification of Record)

On or about November 14, 2017, in Passaic County, in the District of New Jersey, and elsewhere, defendant

**MICHAEL CHEFF**

knowingly concealed, covered up, falsified, and made false entries in a Paterson Police Department Incident Report with the intent to impede, obstruct and influence the investigation and proper administration of matters within the jurisdiction of the United States Department of Justice and the FBI, and in relation to and contemplation of such matters.

In violation of Title 18, United States Code, Section 1519 and Section 2.

**ATTACHMENT B**

I, Kelly Blanchfield, am a Special Agent with the Federal Bureau of Investigation. I am aware of the facts contained herein based upon interviews and briefings with other law enforcement officers and interviews of witnesses. I also have reviewed other evidence, including Internal Affairs complaints and text message communications. Because this complaint is being submitted for the limited purpose of establishing probable cause, I have not set forth herein each and every fact that I know or that has been told to me concerning this investigation. Unless specifically indicated, any statements herein attributed to individuals are set forth in substance and in part.

1. At times relevant to this Complaint:

    a. Defendant MICHAEL CHEFF ("CHEFF") was a Sergeant employed by the Paterson Police Department ("PPD) in Paterson, New Jersey.

    b. Cooperating Witness ("CW")-1, CW-2, CW-3, and CW-4 were police officers employed by the PPD. CW-1, CW-2, CW-3, and CW-4 have entered pleas of guilty to, among other charges, conspiring to: (a) stop and search vehicles and the drivers and passengers of those vehicles, without legal basis; and (b) steal money from the drivers and passengers of those vehicles, in violation of Title 18, United States Code, Section 241. CW-1, CW-2, CW-3, and CW-4 have provided information to law enforcement in the hopes of obtaining a lesser sentence.

2. According to CW-1 and CW-2, after stealing money from drivers and passengers of vehicles, CW-1 and CW-2 passed along a portion of the stolen proceeds to CHEFF. CW-1 and CW-2 provided CHEFF with false police reports that omitted the illegal searches of vehicles and the illegal seizure of monies, and CHEFF, as a Sergeant, approved all the reports without making any corrections. In or around 2016, according to CW-1, CHEFF told CW-1 to start "tagging," or logging into evidence, some of the money that CW-1 was stealing, because effecting narcotics arrests without logging money into evidence would otherwise raise questions. CW-1 subsequently began logging into evidence a portion of the money recovered from CW-1's narcotics arrests.

3. As set forth below, according to information provided by CW-1, CW-3, CW-4, and others, CHEFF: (a) stole money from a safe in an apartment, in Paterson, on or about November 14, 2017; (b) approved a police report that falsely omitted the theft of money; and (c) passed along a portion of the stolen proceeds to CW-1 and CW-4.

3

4.      On or about November 14, 2017, in Paterson, CW-1, CW-3, and CW-4 illegally searched a vehicle around Plesinger Place in Paterson. CW-3 arrested and handcuffed the driver of the vehicle ("Victim 1") and stole a few hundred dollars from Victim 1. All of the officers then went to Victim 1's apartment, a short distance away from the stopped vehicle.

5.      According to CW-4, CW-4 stayed with Victim 1, as Victim 1 was handcuffed in a police car. CHEFF appeared on scene, driving an SUV, and joined CW-1 and CW-3. The three officers – CW-1, CW-3, and CHEFF – entered Victim 1's apartment.

6.      CW-1, CW-3, and CHEFF obtained consent from Victim 1's mother to search Victim 1's apartment. According to Victim 1's mother, the officers falsely told her that she needed to sign a consent search form to acknowledge that the officers were in her apartment. Victim 1's mother signed the consent form, and the officers subsequently searched Victim 1's room. CW-3 confirmed that the officers lied to Victim 1's mother to obtain consent to search the apartment.

7.      According to Victim 1's mother, there were three officers in the apartment. Victim 1's mother identified CW-1 and CW-3 and also confirmed the presence of a third white male police officer, shorter and smaller than the other two officers, a description consistent with that of CHEFF.

8.      According to CW-1, there was a safe inside a closet in Victim 1's room. CW-1 observed CHEFF open the safe. CW-1 observed CHEFF remove cash and narcotics from the safe and place them into his pocket. According to CW-1, CHEFF then gave a portion of the cash and narcotics to CW-1 and CW-3 to place into evidence. CHEFF kept the remainder of the cash. According to CW-1, prior to entering the apartment, Victim 1 told the officers that Victim 1 had approximately $2,000 in Victim 1's safe.

9.      CW-3 has also confirmed that there was a safe inside Victim 1's room; that CHEFF opened the safe; and that CHEFF removed the contents of the safe and placed them into his pocket. Additionally, according to CW-3, CHEFF gave a small portion of the cash from the safe to CW-3 to log into evidence.

10.     After searching Victim 1's room and taking money and narcotics, the officers departed the apartment and went to PPD headquarters with Victim 1. According to CW-3, at PPD headquarters, CHEFF gave CW-3 an additional amount of money and told CW-3 to "tag it all." In total, CW-3 "tagged" $319 into evidence.

11.     Victim 1 stated that CW-3 arrested and searched Victim 1 and took approximately $300 from Victim 1's coat; that CW-3 placed Victim 1 into CW-

4

3's police car; and that the officers then went to Victim 1's apartment and left Victim 1 handcuffed in the police car. According to Victim 1, another officer in an SUV arrived on scene, but Victim 1 believed that this officer quickly departed the scene. Finally, Victim 1 stated that Victim 1 had a safe in his room that contained approximately $2,700 and that the safe was empty following the officers' search of Victim 1's apartment.

12. CW-3 wrote the Incident Report for the arrest of Victim 1 and the subsequent search of Victim 1's apartment. In the Incident Report, CW-3 wrote that the search of Victim 1's apartment yielded "$319 on the top of a shelf in [Victim 1's] room." The Incident Report did not mention a safe. Additionally, although Victim 1 has stated that Victim 1 believes that the officer in the SUV departed the scene, CW-3 noted in the Incident Report that "Sgt. Cheff was on scene" and that CW-3 "along with [CW-1] and Sgt. Cheff proceeded" to "search the apartment." CHEFF signed and approved this Incident Report, knowing that the search of Victim 1's room had yielded a substantial sum of money, greater than $319, that the money had been located in a safe in Victim 1's room (not on top of a shelf), and that CHEFF had stolen the money from Victim 1.

13. According to CW-1, at PPD headquarters, in a bathroom, CHEFF gave CW-1 approximately $200 and told CW-1 that CW-3 "most likely cut you short." CW-1 had previously told CHEFF that CW-3 routinely "cut [CW-1] short" by stealing money from victims and failing to split the stolen monies evenly among other corrupt officers.

14. According to CW-4 (who did not enter Victim 1's apartment but rather stayed back to guard Victim 1, who was handcuffed and in a police car), CW-4 also encountered CHEFF at PPD headquarters. In a bathroom at PPD headquarters, CHEFF handed CW-4 a portion of the stolen cash.

15. Later that day, on or about November 14, 2017, CW-3 discussed with another Paterson police officer ("Officer 1"), via text messaging, CHEFF's theft of monies:

| | |
|---|---|
| CW-3: | Cheff got us for over a stack today |
| | Lol |
| Officer 1: | Lmao how |
| CW-3: | We got a consent to search at plesinger |
| | There was a safe |
| | … |
| | He grabbed the cash |
| | Suspect said he had $1,500 |
| | Chef [sic] gave me $139 |
| | Lmai |
| | Then $160 later lol |

5

|            | And told me to tag it all |
|------------|---------------------------|
| Officer 1: | Fuckkkkk outta here lmao |
|            | Nigga lied to you |
| CW-3:      | Word up man |
|            | Who the suspect ? |
| Officer 1: | Can't say anything tho |
|            | Cheff will look us out no matter what b |
| CW-3:      | We had already gotten mangoes earlier lol |
| Officer 1: | He low key pulled rank |
| CW-3:      | So it was whatever r |
|            | Lol from now on |
|            | Everybody's car is getting searched and everyone is getting asked if we can search their car |
|            | And threaten to lock up their momma if they don't let us search their house lmao |

According to CW-3, the officers used the word "mango" to refer to cash. CW-3 submitted $319 into evidence, $20 more than the $299 ($139 + $160) that CW-3 referenced in the text messages with Officer 1.

16.  On or about November 14, 2017, CW-3 and CW-4 also discussed over text message CHEFF's theft of monies:

| CW-4: | Nigga I want my cut lol. Thought there should've been something more |
|-------|----------------------------------------------------------------------|
| CW-3: | Yea $200 |
|       | But that's not from the safe |
|       | Lol ur boss has that |
| CW-4: | Nig he beat us all. Cool if I collect that from u day 4. |
| CW-3: | Well it's $200 split 3 ways |
|       | So $65 |
|       | I'll give it to [CW-1] |
|       | I'm not in day 4 |
|       | Only reason I tagged that much mango was because Cheff made me |
|       | Just FYI |
| CW-4: | Appreciate it. I'll see you next 4 bud |

According to CW-3, CW-3 told CW-4 that he stole $200 from Victim 1's person, not from Victim 1's safe. CW-3 agreed to split that $200 that he had stolen from Victim 1 with CW-1 and CW-4. However, CW-3 noted that "ur boss," referring to CHEFF, had taken the money "from the safe."