# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA : | | Hon.  Katharine S. Hayden |
| | : | |
| v. | : | Crim. No. 20-209 (KSH) |
| | : | |
| MICHAEL CHEFF | : | |

---

## MEMORANDUM IN OPPOSITION TO DEFENDANT'S RULE 29 AND 33 MOTIONS

---

PHILIP R. SELLINGER
UNITED STATES ATTORNEY
United States Attorney's Office
District of New Jersey
970 Broad Street
Newark, New Jersey 07102
(973) 645-2700

On the Memorandum:

Jihee G. Suh
Thomas S. Kearney
Assistant U.S. Attorneys

Bruce P. Keller
Special Counsel to the U.S. Attorney

# TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES ........................................................................ ii

PRELIMINARY STATEMENT ................................................................. 1

STATEMENT OF FACTS ......................................................................... 2

PROCEDURAL HISTORY ..................................................................... 10

ARGUMENT ........................................................................................... 19

I.   Cheff Can't Meet The Applicable Legal Standards. ............................ 19

    A.   The Rule 29 Standard. ............................................................. 19

    B.   The Rule 33 Standard. ............................................................. 20

II.  More Than Sufficient Evidence Proved Cheff's Guilt On
    Both Counts. ............................................................................ 22

    A.   The Jury Had Ample Evidence Cheff Conspired To
        Deprive Victims Of Their Civil Rights. ................................... 22

    B.   The Jury Had Ample Evidence That Cheff Knowingly
        Falsified Reports. ...................................................................... 25

III. Cheff Is Not Entitled To A New Trial Under Rule 33. ........................ 27

    A.   Cheff Consented To The Court's Proper Instructions
        About How The Jury Should Handle Their
        Deliberations. ........................................................................... 27

    B.   The Jury Wasn't Coerced. ....................................................... 31

    C.   The Government Didn't Vouch For Its Witnesses. ................... 35

    D.   Cheff Consented To The Proper Jury Instruction On Count
        2. ............................................................................................... 38

CONCLUSION ....................................................................................... 40

i

# TABLE OF AUTHORITIES

**CASES**                                                              **PAGE(S)**

*Gov't of the V.I. v. Derricks*,
   810 F.2d 50 (3d Cir. 1987)........................................................................ 21

*Jenkins v. United States*,
   380 U.S. 445 (1965) ............................................................................... 32

*Lawn v. United States*,
   355 U.S. 339........................................................................................... 36

*Lutz Surgical Partners PLLC v. Aetna, Inc.*,
   No. 15-CV-02595, 2021 WL 2549343, (D.N.J. June 21, 2021) .................. 19

*United States v. Amirnazmi*,
   648 F.Supp. 2d 718 (E.D. Pa. 2009) *aff'd*, 645 F.3d 564 (3d Cir. 2011)..... 22

*United States v. Boone*,
   458 F.3d 321 (3d Cir. 2006)................................................................32, 34

*United States v. Brodie*,
   403 F.3d 123 (3d Cir. 2005)..................................................................... 20

*United States v. Bunchuk*,
   799 F. App'x 100 (3d Cir. 2019) .............................................................. 34

*United States v. Claxton*,
   685 F.3d 300 (3d Cir. 2012)..................................................................... 20

*United States v. Cocchiola*,
   358 F. App'x 376 (3d Cir. 2009) .............................................................. 29

*United States v. Console*,
   13 F.3d 641 (3d Cir. 1993)....................................................................... 28

*United States v. Cox*,
   324 F.3d 77 (2d Cir. 2003)....................................................................... 33

*United States v. Dollson*,
   609 F. App'x. 108 (3d Cir. 2015).........................................................35, 37

*United States v. Fioravanti,*
    412 F.2d 407.................................................................................. 31

*United States v. Flores,*
    454 F.3d 149 (3d Cir. 2006).......................................................... 20

*United States v. Friedland,*
    660 F.2d 919 (3d Cir. 1981).......................................................... 21

*United States v. Jackson,*
    443 F.3d 293 (3d Cir.2006)....................................................32, 34

*United States v. James,*
    955 F.3d 336 (3d Cir. 2020).......................................................... 19

*United States v. Johnson,*
    302 F.3d 139 (3d Cir. 2002).......................................................... 21

*United States v. Kuzniar,*
    881 F.2d 466 (7th Cir. 1989).......................................................... 27

*United States v. Lewis,*
    447 F. App'x. 310 (3d Cir. 2011) .................................................. 21

*United States v. Lore,*
    430 F.3d 190 (3d Cir. 2005)....................................................19, 35

*United States v. Martinez,*
    69 F. App'x. 513 (3d Cir.2003) ..................................................... 22

*United States v. McCourty,*
    562 F.3d 458 (2d Cir. 2009).......................................................... 27

*United States v. McNeill,*
    887 F.2d 448 (3d Cir. 1989).......................................................... 20

*United States v. Molina-Guevera,*
    96 F.3d 698 (3d Cir. 1996)............................................................ 36

*United States v. Ozcelik,*
    527 F.3d 88 (3d Cir. 2008)............................................................ 20

*United States v. Perez,*
    144 F.3d 204 (2d Cir. 1998) ...................................................................... 36

*United States v. Resko,*
    3 F.3d 684 (3d Cir. 1993) ........................................................................ 33

*United States v. Rodriguez,*
    151 F. App'x 182 (3d Cir. 2005) ............................................................. 33

*United States v. Salahuddin,*
    765 F.3d 329 (3d Cir. 2014) .................................................................... 21

*United States v. Sandini,*
    888 F.2d 300 (3d Cir. 1989) .................................................................... 20

*United States v. Scanzello,*
    832 F.2d 18 (3d Cir. 1987) ...................................................................... 20

*United States v. Silveus,*
    542 F.3d 993 (3d Cir. 2008) ...............................................................21, 27

*United States v. Steele,*
    298 F.3d 906 (9th Cir. 2002) .................................................................. 30

*United States v. Thornton,*
    1 F.3d 149 (3d Cir.1993) ........................................................................ 22

*United States v. Vas,*
    497 F. App'x. 203 (3d Cir. 2012) ........................................................... 21

*United States v. Walker,*
    155 F.3d 180 (3d Cir.1998) .................................................................... 35

*United States v. Warren,*
    306 F. App'x. 682 (2d Cir. 2009) ........................................................... 37

## Rules

Fed. R. Crim. P. 29 ...........................................................................1, 11, 19

Fed. R. Crim. P. 33 ................................................................................*passim*

## PRELIMINARY STATEMENT

Former Paterson Police Department ("PPD") Sergeant Defendant Michael Cheff was convicted of (1) participating in a conspiracy with five other PPD officers to deprive victims of their civil rights, by stealing cash when those individuals were arrested or subjected to illegal stops and searches and (2) falsifying a police incident report about one of these illegal searches. He has moved for a judgment of acquittal pursuant to Fed. R. Crim. P. 29, or, alternatively, a new trial pursuant to Fed. R. Crim. P. 33. Docket Entry ("DE") 76. His motions should be denied.

Cheff was convicted based on eyewitness testimony, corroborating exhibits (including contemporaneous texts among the co-conspirators) and the jury's assessment of witness credibility. Cheff's bare bones assertions of supposed insufficient evidence and errors provide no basis for upsetting the jury's work. It had ample reason to conclude that, just as his co-conspirators knew, Cheff would look out for them "no matter what," because he had a reason to do so -- he personally benefited from the crimes he and his co-conspirators committed. Cheff's Rule 29 motion should be denied.

His Rule 33 motion for a new trial fares no better. The verdicts were not against the weight of the facts and Cheff's after-the-fact allegations that his trial was riddled with supposed legal errors (based principally on jury instructions

1

with which he said he agreed) have no merit.

## STATEMENT OF FACTS

The evidence reviewed by the jury for a day and a half before convicting Cheff included the following:

Cheff, then a PPD sergeant, supervised former officers, Jonathan Bustios ("Bustios"), Daniel Pent ("Pent"), Eudy Ramos ("Ramos"), Frank Toledo ("Toledo"), and Matthew Torres ("Torres") (collectively, "the Officers"). These Officers were assigned to the same "B-1"squad, generally working from 4:30 a.m. to 3:45 p.m.  Trial Transcript ("Tr.") at 489:2-17; 493:11-494:8; 685:8-686:17; 801:23-802:6; 804:1-15.  As their supervisor, Cheff was responsible for reviewing the Officers' reports and other paperwork related to arrests and seizures of money and narcotics, among other things. Tr. at 477:19-479:1; 483:2-484:10; 494:22-495:12; 687:3-24.

The Officers all had been trained in the proper procedures for making stops, searches, and arrests.  They all knew they were supposed to truthfully document their police activities on police records such as incident reports and patrol activity logs, including accurately recording any currency they took in connection with lawful seizures.  Tr. at 474:1-478:13; 481:17-20; 483:19-484:5; 683:7-684:3; 803:20-25.

But, despite their training and oaths, they told the jury that, under Cheff's supervision, they ignored that.  Instead, they stole cash from individuals (often including targeting minorities), detained or arrested for suspected drug offenses, conducted illegal searches of individuals, vehicles, and residences to steal even more cash and falsified police records, including incident reports, currency seizure reports, and patrol activity logs.  Tr. at 497:22-504:10; 505:4-507:19; 516:14-517:4; 678:17-679:8; 688:3-689:13; 701:20-706:11; 708:6-709:4; 805:13-807:5; 844:3-20; 961:2-962:16; 1071:16-1073:7; Government Trial Exhibit ("Gov. Ex.") 201; Gov. Ex. 604 (FBI video surveillance of Bustios and Ramos detaining occupants of a vehicle, stealing their cash and later splitting it).

One of the contemporaneous, corroborating pieces of evidence about these thefts was a series of text messages about what they called the "mango," the cash they stole.  Gov. Ex. 202 (Bustios text indicating: "Only reason I tagged that much mango was because Cheff made me"); 212 (text referring to a "mango diet"); Tr. at 509:4-510:12; Tr. at 704:1-24 (Pent explaining that the Officers referred to "drug money" as "mangoes" and that "we would kind of use code works like that to communicate amongst ourselves to say he's got a lot of mangoes, meaning, he's got a lot of money on him . . . .")

3

The jury also learned the Officers split the stolen cash, often with Cheff. Tr. at 499:8-12; 718:5-720:25; 962:25-963:16, 968:6-971:7 (Ramos describing "kicking up" stolen money to a partner or someone who is close or knows about the job, including Cheff); Tr. at 852:25-853:2, 869:14-871:19 (Bustios describing splitting the stolen cash and his conversation with Ramos and Pent about them splitting money with Cheff).

Pent and Ramos were very direct as to why Cheff received a cut: He facilitated the conspiracy and concealed their illegal activities.  Tr. at 544:2-24 (Torres describing what Ramos related about kicking up money to Cheff out of "[w]hatever money was illegally seized . . . in order to keep" Cheff "happy," and "allow us to continuously doing our illegal activities, we would throw money or hand money to the sergeant."); 719:4-720:14 (Pent: He and Ramos gave part of the stolen money to Cheff because, among other reasons, Cheff did not report the Officers' illegal activities and "we had an understanding with him. . . if we took care of him, he would take care of us, he wouldn't bother us as far as any arrests or activity that we were doing . . . whatever we wanted to do, we could do it."); 869:16-871:19 (Bustios: Pent and Ramos told him they paid "the Cheff tax," because Cheff looked out for them and ensured they would not get in trouble).  Not only did Ramos explain he and Pent regularly gave part of the stolen cash proceeds to Cheff, when Cheff personally stole

4

money from an arrestee in 2016 in front of Pent and Ramos, that "showed us that he was part of the team . . . he knew that we were taking money from suspects and we weren't tagging any money.  So when he did it right in front of us, he made it seem it was okay.  And it was okay for us to kick some money to him too."). Tr. at 964:21-971:7.

This sharing arrangement wasn't a one-way street: Cheff also shared a portion of stolen cash with Ramos and Torres when he stole money.  *See infra* at 7-9 (describing Cheff's role in the illegal search of, and theft of cash from, an apartment on Plesinger Place in Paterson on November 14, 2017 ("Plesinger Place Theft").

The jury heard, several times over, that Cheff facilitated and advanced the conspiracy, knowing of its objective.  He repeatedly approved and signed the Officers' false reports and other paperwork that omitted, or lied about, their illegal activities, and with no questions asked.  Tr. at 508:4-:24; 509:13-16; 709:5-715:17; 717:2-15; 851:20-852:11; 871:22-872:24; 1071:5-8; Gov. Exs. 103, 119, 121.  In fact, the Officers used Cheff for that very purpose, deliberately choosing him over Sergeant Patrick Lenoy ("Lenoy"), another supervisor of the B-1 squad.  The jury learned that was because Lenoy didn't conspire to violate his oath.  Instead, operating, "by the book," Lenoy would

5

ask too many questions raised by obviously falsified reports.  Tr. at 723:12-18; 872:11-22.

The Officers also consistently explained[1] one glaring example of red flag falsehoods in reports that Cheff approved: reports of large amounts of drugs and/or drug paraphernalia having been seized but without any report of cash having been found.  Tr. at 710:11-716:22; 967:1-11; Gov. Ex. 121. Cheff's response to red flags like that wasn't to raise questions, but to warn the Officers to tag more money as evidence or stop stealing for a while to avoid detection and getting flagged by Internal Affairs ("IA") and going even one step further, Cheff ensured that when IA complaints did come in, the Officers aligned their false responses to evade scrutiny.  Tr. at 699:6-23; 700:3-18; 725:8-727:1; 889:17-891:20; 978:1-18 ("[Cheff] told us to start tagging some of the money, because it was looking too suspicious and Internal Affairs was looking into it.").

Rather than scrutinize reports for accuracy and honesty, Cheff gave lessons on how to falsify reports.  Tr. at 705:9-22 (Pent: "if you had a drug arrest and . . . what we wrote in the report wasn't good enough [Cheff] would

---

[1] On all of the material issues in the case, the Officer's testimony was consistent and held up during cross-examination.  Neither at trial, nor in his brief, did Cheff establish any glaring inconsistency.

6

say: Add to this, make it more justified.  So, basically, add a made-up story to justify your actions."); Tr. at 825:1-827:2 (Bustios: Cheff instructed him to change some words in the narrative section of the incident report for the Plesinger Place Theft that related to falsely creating "a fact of probable cause for the search").

The jury also learned Cheff personally stole cash on two separate occasions.  Pent and Ramos told the jury Cheff stole some of the cash all three of them found when searching a suspicious car and arresting its occupants.  Tr. at 691:1-24; 964:21-966:6; 974:6-977:20.  When Ramos, Pent, and Cheff were at the police station to complete the reports for the arrest and seizure of cash, Cheff took approximately $600 of the total $1,100 that was seized, put it in his pocket, and walked away -- confirming for Ramos and Pent that Cheff approved of stealing cash and concealing it.  Tr. at 964:18-965:23; 974:10-977:20; 968:2-5.

Then there was the Plesinger Place Theft.  On November 14, 2017, Cheff, assisted by Ramos and Bustios, stole money from a safe in an apartment in Paterson then approved a PPD incident report that omitted the theft of money. Tr. at 535:4-574:14, 581:16-600:24 (Torres); Tr. at 763:25-775:22 (J.S.A.) 808:5-840:1, 844:21-851:11 (Bustios); 981:14-1007:21 (Ramos). Ramos and Torres, who participated in the unlawful stop that led to the arrest

7

and search of that apartment, received a portion of the stolen money from

Cheff.  Perhaps even more compelling than the blow by blow description

provided by the multiple witnesses to the Plesinger Place Theft was the

contemporaneous corroboration provided by Gov. Exs. 201 and 202 -- the

texts messages confirming what happened:

> Bustios:    We got a consent to search at plesinger
> There was a safe
> ….
> He grabbed the cash
> Suspect said he had $1,500
> Chef [sic] gave me $139
> Lmai [sic]
> Then $160 later lol
> And told me to tag it all
>
> Toledo:    Fuckkkkk outta here lmao
> Nigga lied to you
>
> [ . . . ]
>
> Toledo:    Can't say anything tho
> ***Cheff will look us out no matter what*** b [*emphasis added*]
>
> Bustios:    Yeah I know I'm just saying
> We had already gotten mangoes [cash] earlier lol
>
> Toledo:    He low key pulled rank
>
> Bustios:    So it was whatever r
> Lol from now on
> Everybody's car is getting searched and everyone is getting
> asked if we can search their car
> And threaten to lock up their momma if they don't let us
> search their house lmao

8

Bustios and Torres also texted about Cheff's theft:

Torres:      Nigga I want my cut lol.  Thought there should've been something more

Bustios:    Yea $200
            But that's not from the safe
            Lol ur boss [CHEFF] has that

Torres:      Nig he [CHEFF] beat us all.  Cool if I collect that from u day 4.

Bustios:    Well it's $200 split 3 ways
            I'll give it to Eudy
            I'm not in day 4
            Only reason I tagged that much mango [cash] was because Cheff made me
            Just FYI

Torres:      Appreciate it.  I'll see you next 4 bud

The jury was entitled to note the sharp contrast between the false Plesinger Place Theft report, which Cheff instructed Bustios to edit and rewrite, and the texts about the incident.  Gov. Ex. 103; Tr. at 825:22-827:2. The report falsely stated the victim, J.S.A., dropped a bag containing heroin as he ran from the police, Tr. at 825:22-25, and the search of the apartment yielded only "$319 on the top of a shelf in [J.S.A.'s] room."  In fact, the search yielded approximately $2,700 from the inside of a safe.  Tr. at 772:16-773:1; 816:16-818:5; 830:11-17; 991:2-25.

The report also falsely stated that Bustios read the consent to search form

9

to J.S.A. even though Bustios had not done so and threatened J.S.A. to coerce the latter to sign the form. Tr. at 597:16-21; 769:9-770:21; 828:11-23; 987:10-25.  The report omitted the threats used to obtain consent, as well as that Cheff had taken most of the money found in the safe, giving a portion to Ramos and Torres, and other details.  *Id.*; Tr. at 559:15-560:18; 827:23-828:4; 829:2-9; 991:2-25; 998:6-999:11; Gov. Ex. 103.

## PROCEDURAL HISTORY

Cheff's trial began on May 18, 2022.  The Government presented six witnesses: All five of the co-conspiring Officers and J.S.A., victim of the Plesinger Place Theft.  It introduced multiple corroborating exhibits: police records (including PPD incident reports), telephone toll records, text messages, photographs, FBI video surveillance of Bustios and Ramos, a PPD headquarters diagram, and stipulations between the parties concerning the admissibility of certain exhibits.

Cheff also had a few exhibits: police records, text messages among the Officers, and videos from Bustios's phone.  Cheff chose not to testify. Nonetheless, he now suggests, without context or citations, that "no inquiry was made" as to whether he would testify on his own behalf -- as if that was some kind of error.  DE 76 at 6.  It wasn't, especially where, despite ample opportunity to do so, Cheff did not even suggest he wanted to testify.  *See* Tr.

10

at 1117:15-1118:23 (prior to cross examination of final Government witness, Cheff covering a host of matters related to defense exhibits but not once raising any other matter).  Instead he relied, without objection, on the instructions the jury was given: that he was presumed innocent, had no burden to prove his innocence, to present evidence or to testify and had a right to remain silent and that the jury was prohibited from considering that he may not have testified. Tr. at 445:4-14.

On May 25, 2022, prior to summations, Cheff moved for an acquittal under Rule 29.  Tr. at 1187:4-24.  The Government opposed the motion, with arguments it incorporates here, and this Court denied Cheff's motion, expressly holding this case rested on the credibility of the witnesses, which viewed in the light most favorable to the Government, could not be dismissed pursuant to Rule 29.  Tr. at 1188:19-1189:1.

Accordingly, it was no surprise that Cheff's summation was an all-out attack on the Officers, contending they were liars.  "Now, you put a suit on a thug.  He is still a liar.  You can put a suit on a liar.  He is still a liar.  And the only thing more untrustworthy than a liar is a desperate liar.  There's five desperate liars.  Their testimony can't be believed."  Tr. at 1225:16-20.  Cheff also argued the Officers "can't get their stories straight because they are so committed to lying, that truth isn't even in their DNA," "they are not

11

credible," and Ramos "is a bigger liar [than Bustios]," Tr. at 1228:4-12, 1234:16-17.

Consistent with that failed effort, obviously rejected by the jury, Cheff continues to argue about credibility, contending the Government improperly argued the Officers "were telling the truth." DE 76 at 4. Not so.

The Government did urge the jury to assess the Officers' "credibility," Tr. at 1244:20-22, but only by comparing their testimony to "corroborat[ing] text messages . . . in real time as the crime is being committed," and falsified reports. It submitted that comparing the "perfect alignment" the co-conspirators attempted to achieve with Cheff's help in responding falsely to IA inquiries with testimony containing minor inconsistencies was a way to assess the credibility of the witnesses' testimony and find the witnesses credible. Tr. at 1240:16-18; 1250:9-1251:3.

The Government also responded to Cheff's argument that he was rarely mentioned in text messages and did not receive texts from the Officers.[2] Cheff

---

[2] Cheff had argued: "There were thousands and thousands of text messages over four years among these guys. And there is only one mention of Mike Cheff and money, and that comes from Jonathan Bustios . . . But four years, not once in almost 9,000 messages, do you see Mike Cheff's name with any criminal act." Tr. at 1224:10-15. Then, again, later in his closing argument, Cheff asserted: "There would have been text messages to Cheff or there would have been text messages about Cheff. And you don't have one. You have one

objected that the Government's rebuttal was going beyond Cheff's closing arguments.[3]  The Court instructed the Government to wrap up its rebuttal arguments, which it did.  Tr. at 1254:9-11.  At no point throughout any of this did Cheff ever object to any other aspect of the Government's rebuttal or claim that the Government was vouching.  Tr. at 1191-1221, 1239-1256.

After summation, the Court charged the jury based on the agreed upon instructions.  Tr. at 1171:3-14.  Cheff did not object to any instruction as delivered to the jury, including to the one he now contends was improper for Count 2.  Tr. at 1173:6-1175:21; 1178:19-1179:2.

Nor was there any objection to the schedule for jury deliberations, even as the Memorial Day weekend loomed.  Cheff did not request a specific schedule, did not urge the jury to be required to return on Friday, May 27, if they had not reached a verdict by Thursday, nor did he express any concerns about the possible effect of the holiday on deliberations.  Tr. at  1180:16-1181:11.

---

for November 14th of 2017, that started by Bustios when he is trying to cover himself from what he did." Tr. at 1237:15-19.

[3] The Government's rebuttal point addressed why the number of texts about Cheff was irrelevant (Tr. at 1251:10-16) and that Cheff was not on and part of multiple text chains with the Officers because he was smarter than the Officers about being less obvious about their criminal activities (Tr. at 1252:6-1253:3)

Deliberations began on the afternoon of Wednesday, May 25, 2022. They continued the following day, Thursday, May 26.  The first jury communication came at around 10 that morning, requesting a review of testimony from multiple witnesses.  Tr. at 1311:1-6.  After consulting with the parties, the Court asked the jury to clarify what they wanted.  Tr. at 1313:12-25; 1314:8-11.  They did so.  Tr. at 1314:16-18.  Recognizing the process of identifying the relevant portions of the transcript might take a while, the Court, without objection, advised the jurors to continue working on their deliberations while counsel pinpointed the testimony to be read back.  Tr. at 1314:19-22.

While that was occurring, another communication was received.  Tr. at 1315:4-1324:25:

> One, what happens if we can't agree on one count and agree on the other. As to the disagreed count [which the Court indicated they are not identifying], does this get classified as a hung jury or in this trial what happens when we are at an impasse?  Two, until what time can we give a verdict today?

Tr. at 1324:10-17.

Shortly thereafter, the testimony of four witnesses was read back.  Tr. at 1325:11-1327:18.  Before sending the jury back to deliberate with that testimony fresh in its mind, the Court told the jury, without objection, it could deliberate "[a]s late as you want you can work. . . So you will be the one to tell

14

us how late you want to work." Tr. at 1328:1-4.  Because the jurors had just

heard over thirty minutes of testimony read back (Tr. at 1325:11, 1328:10), the

Court, again without objection, advised the jurors that it was not going to

respond to the part of the third communication related to a potential impasse

on one count.  Tr. at 1328:6-7.

A fourth jury communication followed shortly thereafter:

One, we have reached a verdict on Count Two.
. . . two, we have reached an impasse on Count One.

Tr. at 1328:19-22.  Prior to responding, the Court advised the parties of its

intention to read the modified *Allen* charge to the jurors and then send them

back to the jury room in order to deliberate further.  Tr. at 1328:23-1329:2.

During this colloquy, the Court raised the issue of the possibility of taking a

partial verdict.  Tr. at 1329:2-20.  The Government requested that the modified

*Allen* charge be given at that time and the jurors be sent back to deliberate.  Tr.

at 1329:9-25.  Once again, there was no objection from Cheff, who informed

the Court: "No, I agree with that."  Tr. at 1330:1-3.

The Court brought the jury back into the courtroom and read the Third

Circuit approved model modified *Allen* charge to the jury.  Tr. at 1330:8-

1331:23.  Before sending the jurors back to deliberate further, the Court

advised, "What I have just said is not meant to rush or pressure you into

15

agreeing on a verdict.  Take as much time as you need to discuss things.  There is no hurry."   Tr. at 1331:13-15.

Shortly before 6:22 p.m., the jury sent a fifth communication stating, "We have exhausted our efforts to reach a verdict.  We don't see a path that will change that."  Tr. at 1332:5-9.  At that point, the Court revisited the issue of taking a partial verdict and declaring a mistrial with respect to the remaining undecided count.  Tr. at 1332:10-24.  After conferring with counsel in chambers, the Court placed on the record that, "I believe that it is our consensus that the jury should be told that they have the option of returning a partial verdict."  Tr. at 1333:11-19.  Both Cheff and his counsel agreed that they wanted the Court to take a partial verdict.  Tr. at 1333:20-1334-3.

When the jury returned to the courtroom, they were read the Third Circuit approved model charge related to partial verdicts (No. 9.08), tailored by agreement of the parties. Tr. at 1334:17-1335:23; 1338:12-22.  Specifically, the Court advised the jury that:

> . . . you may return a verdict on [Count Two].  You may continue deliberating on [Count One].  You do not have to do this.  But you can if you wish.  You should understand that if you chose to return a verdict on Count Two now, that verdict will be final.
>
> I'm going to ask you that you return upstairs.  Advise us if you wish to return a partial verdict, specifically, a verdict on Count Two or continue further deliberations as to Count One.  The choice is yours.  Please let us know in writing.

Tr. at 1335:3-12.

The jury returned to their deliberations and, for approximately the next 30 minutes, worked away without directly answering the Court's question as to whether they preferred to return a partial verdict or continue deliberating.  Tr. at 1335:14-1336-2.  The Court asked the Courtroom Deputy, again without objection, to check on that.  Tr. at 1335:23-1336-1.  At 7:14 p.m., the Court read into the record a sixth jury communication: "We are getting closer to a verdict on both counts.  We can deliver both at the same time."  Tr. at 1336:2-5.

It was only then, that Cheff raised an issue with respect to one of the deliberating jurors.  He speculated that one of the jurors, No. 8, faced "time concerns" and "time pressure" about returning to deliberate on Friday, May 27, 2022 because of pre-existing moving plans that day.  Tr. at 1336:20-1337:3.  Without citing anything at all, he alluded to "extra comments and communications with the jury about scheduling issues."  Tr. at 1339:1-2.

In fact, during *voir dire*, Juror No. 8 previously disclosed she was "moving at the end of the month [May]" and that she would be away the second and third weeks of June.  Tr. at 87:19-93-6.  The Court also noted it had been completely transparent with the parties about Juror No. 8's recent reminder about her scheduling issue and had in fact disclosed that information

17

during the in-chambers conference when the parties were discussing giving the partial verdict charge to the jury.  Tr. at 1339:8-9.  With full knowledge of Juror No. 8's potential scheduling issue, Cheff had agreed that the Court should give the model partial verdict charge. Tr. at 1338:12-22; 1340:4-7.  The Court further noted that it would be polling that juror, as well as all of the deliberating jurors, with respect to the final verdict.  Tr. at 1339:20-25.

At approximately 7:34 p.m., the jury announced its verdict, finding Cheff guilty of both conspiracy to deprive persons of civil rights (Count 1) and falsification of records (Count 2).  Tr. at 1341:11-1342:12.  Prior to polling the jury, the Court noted that the jury had previously sent communications about a potential impasse at various stages of their deliberations and that they had also been given various legal instructions, including one permitting a partial verdict.  Tr. at 1342:17-24.  The Court then advised the jurors it would be polling each of them individually, asking whether they reached the guilty verdict on both counts "without undue pressure, without time pressure," and instead, made a decision that was their "free and honest verdict." Tr. at 1343:1-5.  All twelve of the deliberating jurors, including Juror No. 8, responded affirmatively.  Tr. at 1343:6-1344:6.  Afterwards, the Court asked if either party would like any other questions related to the verdict posed to the jury -- Cheff responded: no.  Tr. at 1344:7-13.

18

**ARGUMENT**

## I.    Cheff Can't Meet The Applicable Legal Standards.

Cheff's Rule 29 and 33 arguments motions suffer from multiple flaws.

Chief among them is that his arguments are little more than bare-bones

assertions, often unaccompanied by any citation to the record, governing

precedent, or explanation.  They are exactly the type of arguments to which no

response is required because they are so undeveloped as to be waived. *See*

*United States v. James*, 955 F.3d 336, 345 n.8 (3d Cir. 2020); *Lutz Surgical*

*Partners PLLC v. Aetna, Inc.*, 2021 WL 2549343, at *9 (D.N.J. June 21, 2021)

(unpublished) ("perfunctory and undeveloped arguments, and arguments that

are unsupported by pertinent authority, are waived.").  His motions can be

denied on that basis alone.

### A.    The Rule 29 Standard.

A Rule 29 motion can't be granted unless "the evidence is insufficient to

sustain a conviction."  Fed. R. Crim. P. 29(a).  "The burden on a defendant

who raises a challenge to the sufficiency of the evidence is extremely high."

*United States v. Lore*, 430 F.3d 190, 203-04 (3d Cir. 2005) (quotation omitted).

In considering a Rule 29 motion, "a court 'must be ever vigilant in the

context of Fed. R. Crim. P. 29 not to usurp the role of the jury by weighing

credibility and assigning weight to the evidence, or by substituting its judgment

19

for that of the jury.'" *United States v. Flores*, 454 F.3d 149, 154 (3d Cir. 2006)

(quoting *United States v. Brodie*, 403 F.3d 123, 133 (3d Cir. 2005)).  Instead, the

Court "must view the evidence and the inferences logically deducible

therefrom in the light most favorable to the government," *United States v.*

*McNeill*, 887 F.2d 448, 450 (3d Cir. 1989).  Perhaps most importantly for

purposes of this case, a court must resolve all credibility issues in the

Government's favor.  *United States v. Scanzello*, 832 F.2d 18, 21 (3d Cir. 1987).

The Court must uphold the jury's verdict as long as "any rational trier of fact

could have found proof of guilt [] beyond a reasonable doubt based on the

available evidence." *United States v. Claxton*, 685 F.3d 300, 305 (3d Cir. 2012)

(quotation omitted).

    The evidence "need not exclude every possible hypothesis of

innocence," *United States v. Ozcelik*, 527 F.3d 88, 94 (3d Cir. 2008) (quotation

omitted), nor must it "be inconsistent with every conclusion save that of guilt if

it does establish a case from which the jury can find the defendant guilty

beyond a reasonable doubt." *United States v. Sandini*, 888 F.2d 300, 311 (3d Cir.

1989) (quotation omitted).

### B.    The Rule 33 Standard.

    Under Federal Rule of Criminal Procedure 33(a), the Court "may vacate

any judgment and grant a new trial if the interest of justice so requires." Fed.

R. Crim. P. 33(a). When evaluating a Rule 33 motion, the district court "does not view the evidence favorably to the Government, but instead exercises its own judgment in assessing the Government's case." *United States v. Johnson*, 302 F.3d 139, 150 (3d Cir. 2002). But authority to grant a new trial pursuant to Rule 33 is limited to instances where "there is a serious danger that a miscarriage of justice has occurred -- that is, that an innocent person has been convicted." *Id.* (quotation omitted). "Thus, motions for a new trial based on the weight of the evidence are not favored. Such motions are to be granted sparingly and only in exceptional cases." *United States v. Salahuddin*, 765 F.3d 329, 346 (3d Cir. 2014) (quotation omitted); *United States v. Silveus*, 542 F.3d 993, 1004-05 (3d Cir. 2008); *Gov't of the V.I. v. Derricks*, 810 F.2d 50, 55 (3d Cir. 1987).

When, as is the case here, a Rule 33 motion is heavily predicated on witness credibility, the jury's apparent decision to credit that testimony despite impeachment efforts is a relevant consideration. *See United States v. Friedland*, 660 F.2d 919, 931-32 (3d Cir. 1981); *United States v. Vas*, 497 F. App'x. 203, 206 (3d Cir. 2012) (not precedential) (affirming denial of Rule 33 motion despite minor inconsistencies and weaknesses in Government witnesses' testimony); *United States v. Lewis*, 447 F. App'x. 310, 314 (3d Cir. 2011) (not precedential) (affirming denial of Rule 33 motion where defendant failed to

successfully impeach the Government's cooperating witnesses at trial).

A district court also has authority under Rule 33 to grant a new trial for errors occurring during trial that affected its outcome. A court may grant a motion for new trial if it finds errors occurred during the trial and these errors "when combined, so infected the jury's deliberations that they had a substantial influence on the outcome of the trial." *United States v. Thornton*, 1 F.3d 149, 156 (3d Cir. 1993) (quotation omitted). Harmless errors that do not deprive a defendant of a fair trial provide no basis for granting a defendant's Rule 33 motion. *Id.* The defendant bears the burden of proving a new trial should be granted, and must therefore show "(1) that error occurred at trial, and (2) that error had a substantial influence on the verdict." *United States v. Amirnazmi*, 648 F. Supp. 2d 718, 720 (E.D. Pa. 2009), *aff'd*, 645 F.3d 564 (3d Cir. 2011). Motions for a new trial are disfavored and "only granted with great caution and at the discretion of the trial court." *United States v. Martinez*, 69 F. App'x. 513, 516 (3d Cir. 2003) (not precedential).

## II.  More Than Sufficient Evidence Proved Cheff's Guilt On Both Counts.

### A.  The Jury Had Ample Evidence Cheff Conspired To Deprive Victims Of Their Civil Rights.

Cheff argues there was insufficient evidence to convict him of conspiring with the Officers to deprive persons of their civil rights. DE 76 at 11-13. That ignores, among other things, that each of Cheff's co-conspirator officers

testified that, while on duty, they conducted illegal stops and searches to steal money from individuals in Paterson (particularly those suspected of drug offenses) and stole money from arrests they made and from stops and searches of individuals, vehicles, and homes.

They told the jury how they planned, discussed, and committed these illegal police activities with each other.  They told the jury that Cheff was a party to that agreement and joined in the conspiracy knowing of its objective.  That alone would have sufficed to convict Cheff as a willing and knowing participant in the scheme.

But the jury had even more: Damning testimony and corroborating texts regarding Cheff's participation in the Plesinger Place Theft.  That evidence allowed the jury to conclude that Cheff joined in the illegal search of the victim's apartment, stole the money himself from the victim's safe, gave a small portion of the stolen cash to Bustios to tag for appearance's sake, signed off on a false incident report indicating that only $319 had been seized on the top of a shelf with no mention of the victim's safe, and split a small part of the stolen cash with Torres and Ramos.  *Supra* at 7-10.

But the jury also had even more than that: It heard Cheff warned the Officers to tag more money when seizing cash to avoid detection by IA.  Tr. at 978:1-18.  The jury could have rationally concluded Cheff did so based on his

23

knowledge of their illegal activities and recognition that the Officers were becoming too brazen and careless about how much they were stealing.  The jury also heard he had to warn the Officers to slow down or pause their illegal activities because they were under IA scrutiny. Tr. at 699:6-23; 700:3-18. It also heard Cheff took steps to cover up those thefts, by routinely signing off on false incident reports related to the thefts of seized cash, instructing the Officers on how to embellish facts in the narrative section to create the appearance of a lawful basis for their otherwise illegal stops and searches, and ensuring that the Officers aligned and refined their responses to IA investigations.  *Supra* at 6.

When Cheff argues that the evidence of his role in the conspiracy was insufficient, DE 76 at 11-13, he doesn't address any of this.  Instead, he relies on a series of *non sequiturs*, contending there was no evidence that he engaged in the use of excessive force, stopped individuals in Paterson without reasonable suspicion, threatened and lied to individuals in Paterson to obtain their consent to search their residences and that mere presence at the scene of a crime is not sufficient proof of membership in a conspiracy (and even less so when Spanish is being spoken and Cheff didn't speak Spanish).

But none of that speaks to the only point that matters: All of the other facts that support the jury's decision to convict Cheff.  There was more than enough to support Cheff's conviction for the many reasons described above.

24

Cheff's final argument on this issue (DE 76 at 13) is that, in addition to the "suspect" credibility of the Officers, he was only one of many of superiors, That hardly helps him.  The jury heard that the very reason the Officers didn't go to their other sergeant was that they perceived him as honest and operating "by the book."  Tr. at 723:12-18; 872:11-22.  From that, it was entitled to conclude that Cheff was neither honest nor book abiding and that's why the Officers sought him out.

There is no basis for overturning the jury's verdict on Count 1.

**B.**      **The Jury Had Ample Evidence That Cheff Knowingly Falsified Reports.**

Cheff's motion on Count 2 is also without merit.  He argues the Plesinger Place Theft incident report, (Gov. Ex. 103) is "literally true."  DE 76 at 13.  To support that, however, he cherry picks a few, immaterial accuracies in the narrative.  The jury, however, was entitled to credit all of the other evidence proving Cheff's falsification of that report.

For example, the minor issue of whether the victim ran when he saw the police that day was not identified as one of the false statements made in the report.  *E.g.*, Tr. at 828:19-829:9; 830:11-831:4; 1210:17-19; 1212:7-14 .  It is irrelevant to the material falsehood identified for the jury -- that the report falsely states $319 was found in the apartment on top of a shelf.  Gov. Ex. 103. Ample evidence established there was significantly more cash found in the

apartment (when the victim had counted that morning, it totaled approximately $2,700), it was in a safe, not on a shelf, and Cheff stole the rest. *Supra* at 7-10.

Cheff also misdirects when he points out the report states J.S.A. "did drop something when he was being chased." DE 76 at 13. But the falsehood wasn't *whether* something was dropped, it was *what* was dropped. The jury heard Bustios explain that the statement in the report concerning the dropped bag was a false embellishment: A detail added to create probable cause when there wasn't any. Tr. at 825:22-25 (Bustios: [J.S.A.] did not drop a bag). Instead, J.S.A. dropped his keys. Tr. at 767:12-13. Cheff had Bustios rewrite the line related to the purportedly dropped bag to fabricate probable cause for the stop and search. *See* Tr. at 825:22-827:2.

Cheff ignores yet another material false statement added to the report to conceal that neither Cheff, nor anyone else, had any legal basis to enter the apartment: the lie that Bustios read and explained the consent form in its entirety to J.S.A. Gov. Ex. 103. The jury heard Bustios testify that he did not do so and that was corroborated by Ramos and Torres. Tr. at 597:16-25; 828:11-23; 987:10-25.

The Court sat through all of this evidence of falsehoods about the report on the Plesinger Place Theft and has seen that there is no basis for setting aside

26

the jury's verdict on Count 2.

## III.   Cheff Is Not Entitled To A New Trial Under Rule 33.

Cheff claims errors "inside and outside the Courtroom" warrant a new

trial under Rule 33.  Cheff's claims about procedural errors are meritless.  They

have no support in the trial record.

Supposed errors aside, to the extent Cheff's motion also contends the

verdicts were against the weight of the evidence, the Court may grant it only if

"the interest of justice so requires," Fed. R. Crim P. 33(a), and even then, only

it must believe "an innocent person has been convicted." *United States v.*

*Silveus*, 542 F.3d 993, 1004-05 (3d Cir. 2008).  In particular, given Cheff's

strategy of attacking the credibility of Government witnesses, "it is only where

exceptional circumstances can be demonstrated that the trial judge may intrude

upon the jury function of credibility assessment . . . [such as] where testimony

is patently incredible or defies physical realities . . . ."  *United States v. McCourty*,

562 F.3d 458, 475-76 (2d Cir. 2009); *see also United States v. Kuzniar*, 881 F.2d

466, 471 (7th Cir. 1989).  The reasons Cheff's motion fails to successfully

attack witness credibility are palpable, as discussed above.  *See supra* at 23-26.

### A.   Cheff Consented To The Court's Proper Instructions About How The Jury Should Handle Their Deliberations.

Cheff claims, for the first time, incorrect jury instructions were provided

in response to "several notes" the jury sent regarding the progress of

27

deliberations.  DE 76 at 8.  He now suggests that a deadlock charge (pursuant to Third Circuit Model Jury Instruction 9.05) should have been given, rather than the modified Allen charge (Third Circuit Model Jury Instruction 9.08), as soon as the jury communicated they were at an impasse.  But Cheff agreed the modified *Allen* charge should be read to the jury at that point and offers nothing to support that only his belated alternative would have been proper.

Before addressing the jurors about the potential impasse, the Court advised the parties that it intended to read the modified *Allen* charge and send the jurors back to continue deliberations.  Tr. at 1328:23-1329:2.  Asked if there was any problem reading the modified *Allen* charge at that point, Cheff responded, "No, I agree with that."  Tr. at 1330:1-3.  That ends the matter. Cheff can't complain, in a motion for a new trial, of alleged errors invited or induced by himself, particularly where, as here, it is clear he was not prejudiced.  *United States v. Console*, 13 F.3d 641, 660 (3d Cir. 1993).

Consent aside, this Court properly handled the juror communications. When, for the first time, the jury expressed it had reached an impasse on Count 1, this Court sought input from both parties and obtained Cheff's agreement to the modified *Allen* charge.[4]  The Court went on to instruct the

---

[4] That instruction suggested the jurors should not hesitate to re-examine their own views if convinced that said views were erroneous but cautioned against

jurors that the modified *Allen* charge was not meant to rush their decision and that they should take as much time as needed for their discussion. Tr. at 1331:13-15.  When the jurors subsequently expressed they had "exhausted [their] efforts to reach a verdict" and did not "see a path that will change that," the Court again sought input from both sides.  Cheff agreed that the Third Circuit partial verdict jury charge (No. 9.08) should be given.  *Supra* at 15-16; Tr. at 1332:13-1335:23; 1338:12-22.

In fact, the Court took an extra step and directly questioned both Cheff and his counsel whether they wanted the Court to take a partial verdict if needed.  Both said yes.  Tr. at 1333:20-1334:3. The jury was then brought back to the courtroom at 6:41 p.m. and were instructed on the Third Circuit approved model charge, tailored by the parties, related to partial verdicts. *Supra* at 15-16; Tr. at 1334:17-1335:12.  There is no improper coercion when, with the defendant's consent, the Court applies Third Circuit model instructions.  *See* Third Circuit Model Criminal Jury Instructions 9:05 & Comment, 9:08 & Comment; *United States v. Cocchiola*, 358 F. App'x 376, 379-380 (3d Cir. 2009) (not precedential) (trial court did not abuse its discretion because it gave jury instruction essentially identical to Model Instruction 9.05

---

surrendering their honest convictions for the mere purpose of returning a verdict.  Tr. at 1331:4-9.

when jury indicated that it was hopelessly deadlocked); *United States v. Steele*, 298 F.3d 906, 911 (9th Cir. 2002) (court's adherence to that circuit's model criminal jury instructions when delivering Allen charge was one of the factors that showed there was no coercion by trial court when responding to jury note that they reached an impasse).

Cheff next speculates, incorrectly, that Juror No. 8 may have surrendered "her convictions in order to finish deliberations that day."  DE 76 at 8.  Not so.

First, Cheff is wrong to contend Juror No. 8 had pre-arranged plans for the end of the month and was allowed to remain as a juror "in the event the trial finished before the Memorial Day weekend."  DE 76 at 2.  Second, he erroneously claims "an objection was raised to keeping the jury late on Thursday, May 26, 2022."  DE 76 at 8.

With respect to the first misstatement, it was clear from the outset of the jury *voir dire* that Juror No. 8 was "moving at the end of the month [May]" and that she would also be unavailable for the second and third **weeks** of June, not the second and third days of June.  Tr. at 87:19-93-6.

With respect to the second misstatement, no objection was raised as to keeping the jury later on Thursday evening.  While responding to a prior jury communication in the middle of Thursday afternoon, the Court advised the

jury that they could stay, "As late as you want" and that the jury would be "the one to tell us how late you want to work." Tr. at 1328:1-4. Cheff did not object then, or at any other time regarding jury deliberations continuing later into the evening. Moreover, on May 24, when the Court discussed the schedule for jury deliberations before they started and raised the potential scenario where the jury was still deliberating on Thursday, May 26, on the eve of the holiday weekend, Cheff neither requested any specific schedule nor expressed any concerns about how the upcoming Memorial Day weekend might affect jury deliberations. Tr. at 1180:16-1181:11. Only after the jury indicated they were close to reaching a verdict on both counts did Cheff raise any issue about timing, and even then limited it to the possible conflict that Juror No. 8 had on Friday. Simply stated, nothing pressured the jury to reach a verdict on Thursday evening.

      **B.**    **The Jury Wasn't Coerced.**

Factual mistakes and his own consent aside, Cheff also is wrong on the law when he suggests the jury was improperly coerced into reaching a verdict. Although "a judge may not 'coerce' the jury into reaching a verdict," *United States v. Fioravanti,* 412 F.2d 407, 416 n. 20 (3d Cir. 1969), that only occurs when the charge in dispute "caused the jury to be influenced by concerns irrelevant to their task and where the jury reached its subsequent verdict for

reasons other than the evidence presented to it." *United States v. Boone*, 458 F.3d 321, 326 (3d Cir. 2006) (internal citations and quotations omitted). Typically, the question of whether a court's charge to the jury is impermissibly coercive arises where the court must give a supplemental jury charge to a jury that has indicated it is deadlocked. *See, e.g., Jenkins v. United States*, 380 U.S. 445 (1965) (supplemental charge to a deadlocked jury that "[y]ou have got to reach a decision in this case" was, in its context and under all the circumstances, coercive).

Put another way, for a jury verdict to have been improperly coerced, it must have been reached for reasons other than the evidence presented to it, as when the jury has been "browbeat[en]" into basing its verdict on concerns irrelevant to the jury's task. *United States v. Jackson*, 443 F.3d 293, 297-98 (3d Cir. 2006); *Boone*, 458 F.3d at 326. Cheff points to nothing like that. Instead, he relies on multiple layers of assumptions and pure speculation. He first assumes Juror No. 8 was the juror, or among the jurors who had caused the initial impasse on Count 1. Second he assumes that Juror No. 8 violated her oath and surrendered her honest conviction for the mere purpose of returning a verdict so that she could avoid coming to court on her moving day.

But these unwarranted assumptions are contradicted by known facts. At the outset, Juror No. 8 advised the parties in open court that she was "moving

32

at the end of the month [May]" and that she would also be unavailable for the second and third weeks of June.  Even had Juror No. 8 been the juror who had caused the initial impasse on Count 1 and surrendered her honest conviction for the mere purpose of returning a verdict, there were multiple opportunities for her, the foreperson, or any of the jurors to notify the Court of such time pressure or coercion.  The record shows that didn't happen.

All of the jurors were polled individually and affirmatively stated that they reached the guilty verdict on both counts "without undue pressure," "without time pressure," and that in fact, the verdict represented their "free and honest verdict."  Tr. at 1343:1-1344:6.  That should be the end of the matter.  Nothing supports setting aside a verdict after that.  Speculation, as opposed to unequivocal proof of prejudice-inducing juror misconduct plainly isn't enough.  *United States v. Rodriguez*, 151 F. App'x 182, 185 (3d Cir. 2005) (not precedential).  Instead, facts and a concrete showing of prejudice from misconduct is the "touchstone" of relief.  *United States v. Resko*, 3 F.3d 684, 694 (3d Cir. 1993).  When a trial court is faced with, at best, speculative allegations of prejudice from juror misconduct, doing "less" sometimes is "more."  *United States v. Cox*, 324 F.3d 77, 88 (2d Cir. 2003).  Here, the Court carefully and thoughtfully did no more than needed to address each issue.

Throughout the deliberations, the Court repeatedly instructed the jurors that there was no time constraint.  To amount to improper coercion of a verdict, the trial court must do something to "blast" a deliberating jury into reaching a verdict.  *Jackson*, 443 F.3d at 297.  Coercion requires "undu[e]" emphasis on "the consequences, *i.e.* [the] time, toil, or expense" that accompany the "failure to arrive at an unanimous verdict."  *Id.* at 298.

Although not precedential, the reasoning of the panel in *United States v. Bunchuk*, 799 F. App'x 100 (3d Cir. 2019) (not precedential), is on point.  In *Bunchuk*, a juror's family issue might have required him to miss the following day of deliberations.  He informed the court of that possibility at 3:30 p.m.  The trial court responded that, if he in fact could not participate, he should notify the court by 4:20 p.m. that day, so the court would have time to consider whether to appoint an alternate and start deliberations over.  It never came to that because the jury returned a verdict at 4:17 p.m.  Despite the curious timing, there was no coercion, because that involves substantial and explicit pressure, from the court, for a verdict or a particular result.  799 F. App'x at 104 (quoting *Boone*, 458 F.3d at 327).

In this case, the Court imposed no time pressure or deadline.  In fact, this jury was repeatedly told that they were under no time constraints to reach a verdict.  It did exactly as the Third Circuit requires and nothing flows from

34

Cheff's vague suggestion at trial: "I don't know if we need to ask her if she felt rushed and had to reach a decision." Tr. at 1337:7-8. Cheff's baseless claim that numerous errors occurred during jury deliberations should be rejected.

### C.   The Government Didn't Vouch For Its Witnesses.

Cheff also asserts "prosecutorial misconduct," claiming, again for the first time that the Government vouched for its witnesses during its opening and summation. DE 76 at 7-8, 16. There was no vouching.

Improper vouching occurs only when the Government seeks to bolster the credibility of one its witnesses during summation by reference to matters that are not in evidence. *See United States v. Dollson*, 609 F. App'x. 108, 111 (3d Cir. 2015) (not precedential). As the Panel explained in *Dollson*:

> A prosecutor improperly vouches when he (1) assures the jury that the testimony of a government witness is credible, and (2) bases his assurance on either his claimed personal knowledge or other information not contained in the record." *United States v. Lore*, 430 F.3d 190, 211 (3d Cir.2005). Where, however, a prosecutor merely "argues that a witness is being truthful based on the testimony given at trial, . . . the prosecutor is engaging in proper argument and is not vouching." *United States v. Walker*, 155 F.3d 180, 187 (3d Cir.1998).

*Id*.

Where, as here, there was no explicit or implicit reference to either the prosecutor's personal knowledge or information not contained in the record, and the Government limited itself to properly admitted evidence and the jury's

reasonable inferences from that evidence, there was no vouching. *See id.*; *Lawn v. United States*, 355 U.S. 339, 359 n. 15 (1958) (where defense counsel attacked the credibility of the cooperating witnesses, the Government permissibly responded that the evidence supported the witnesses' credibility, and "did not say or insinuate that the statement was based on [the prosecutor's] personal knowledge"); *United States v. Perez*, 144 F.3d 204, 209-10 (2d Cir. 1998) (rejecting vouching claim where the "prosecutor did not suggest special knowledge of facts not before the jury," but "directed the jury's attention to the evidence supporting his contention").

Cheff's sole citation about vouching, *United States v. Molina-Guevera*, 96 F.3d 698 (3d Cir. 1996), shows precisely why there was no vouching here. There, the prosecutor argued to the jury that an investigator who was not called to testify at trial would have supported a trial witness's version of events That was an explicit reference to matters outside the record to bolster credibility. That didn't happen here.

In essence, Cheff tries to elevate statements the Government made about consistencies and inconsistencies in the record testimony of the witnesses to improper vouching. He asserts the Government vouched for its witnesses by stating that inconsistencies in the Officers' testimony showed "they were telling the truth." DE76 at 8. That didn't happen either. As part of the

Government's arguments relating to the jury's assessment of witness credibility (*e.g.*, Tr. at 1244:20-22), the Government stated that the Officers' testimony was "corroborated by text messages, text messages, in real time as the crime is being committed" and "corroborated by the falsified reports themselves.  Tr. at 1240:16-18.  The Government also urged the jury to compare the "perfect alignment" Cheff and the Officers reached when they fabricated responses to IA complaints to avoid detection to inconsistencies on minor points and submitted that the latter is a way the jury "can assess the officers' testimonies as credible."  Tr. at 1250:9-1251:3.

That's urging the jury to make comparisons based on the record, not vouching.  *Dollson*, 609 F. App'x. at 111 (among other arguments related to witness credibility, the prosecutor noting to the jury that if the officers who testified against the defendant were contriving a story, "wouldn't their stories be consistent?" was not vouching); *United States v. Warren*, 306 F. App'x. 682, 685 (2d Cir. 2009) (not precedential) ("It is improper for an attorney to vouch for a witness's credibility in a way that implies the existence of extraneous proof; it is permissible, however, for an attorney to submit that a witness is credible, and to support that statement by reference to evidence adduced at trial.").

**D.     Cheff Consented To The Proper Jury Instruction On Count 2.**

Finally, Cheff claims, again for the first time and despite his agreement

at trial, that one of the jury instructions for Count 2[5] erroneously shifted the

burden of proof away from the Government. He then speculates the jury could

have been misled or confused by the instruction.  Cheff claims the Court

rejected the defense proposed charge and provided the charge requested by the

Government instead.  DE 76 at 6-7.

Not so.  Cheff's initial objections to the jury instructions on Count 2

(including Instruction No. 19) were resolved during the jury charge conference

and the instructions were modified in accordance with his requests, resulting in

a revised set of instructions pertaining to Count 2, including Instruction No.

19.  Tr. at 1171:3-1179:2.  He had no objections to explanations in Instruction

No. 19 on what the Government did not have to prove, provided it followed

statements about what the Government had to prove.  Tr. at 1175:11-18 ("The

defendant requested that wherever we have paragraphs like this that spell out

what the government must prove . . . that come first.  And the anything that

we need not prove that that comes later. So we have done that with respect to

---

[5] Cheff does not specify the numbered instruction, but presumably he is
referring to Instruction No. 19 because his brief cites pages 1282-1283 of the
trial transcript.

instruction 19.").  Cheff never contended there was anything wrong with the final version of the instruction as modified. When the Court again gave the parties the opportunity to raise any issues with the final jury instructions, Cheff agreed the instructions were acceptable.  Tr. at 1178:19-1179:2.

That agreement aside, multiple model jury instructions in the Third Circuit relating to elements of offenses -- including those on the conspiracy offense given in this case -- include explanations on what the Government need not prove with respect to a certain element. Tr. at 1275-1276 (relating to Instruction No. 12, "[t]he government does not have to prove the existence of a formal or written agreement or an express oral agreement spelling out the details of the understanding."); Third Circuit Model Instruction 6.18.1341-5 on "Use of Mails" Defined for Mail Fraud (stating that "the government is not required to prove that [the defendant] actually mailed anything . . . ."). Clarifying for the jury what the Government need not prove when explaining what it does need to prove simply is not error.  Cheff's argument that the Court improperly charged the jury with respect to Count 2 is without merit.

## CONCLUSION

For all the foregoing reasons, the United States respectfully requests that

Cheff's motions for a judgment of acquittal and for a new trial be denied.


Respectfully submitted,

PHILIP R. SELLINGER
United States Attorney

By:    /s/ Jihee G. Suh
       /s/ Thomas S. Kearney
       Assistant U.S. Attorneys

       /s/ Bruce P. Keller
       Bruce P. Keller
       Special Counsel to the U.S. Attorney


Dated: July 8, 2022